All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished and give their attention for the court is now sitting. God save the United States and this Honorable Court. All right, thank you. We'll begin with the first case, Jane Doe v. Syverud and Mr. Fogel, whenever you're ready we'll hear from you. Thank you, Judge. Good morning and may it please the court. The essence of qualified immunity is notice to the affected public official of the contours of the right being asserted by a plaintiff. In this case we have several reasons to understand that a reasonable doctor would have understood that he could not employ intrusive medical procedures to a competent individual against her consent. There is common law that goes back to the mid 13th century cited by this court. Just let me interrupt you there because your proposition sort of assumes away the problem. You say competent and this woman was came into the emergency room under an emergency order that said she was about her and they really just wanted to do a preliminary assessment to take blood and urine. So I think you ought to leave open the question of whether she was competent. Obviously, if you have somebody who's competent, you're engaging in a discussion about whether to treat somebody or not. We have all those cases that talk about that and where somebody isn't even in a coma, the family's there and they're discussing it. We have those cases. But the issue here I think you have to start with the fact that she came into the emergency room under an emergency custody order in which there was a magistrate judge had found probable cause that she was mentally ill. And of course, the doctor doesn't know anything further from that point. So I think it would be better if you phrase the question somehow not as to assume the competence because the doctor, the doctor could well be flawed if he if somebody came in and was uh mentally ill and couldn't make the correct judgment or was under a deep depression or or in this case possibly could have had toxic chemicals in her blood and would have died while in the emergency room. I mean, that's uh these are the issues I think you have to present to be fair to the case. Well, the reason I started that way is because Dr. Severud in his papers acknowledges that she was competent to make medical decisions. Well, uh I don't know any way around the admission. No, you can, you can argue that. Obviously you can argue that. But the emergency medical order which was found by a magistrate judge is what presented the uh presented the circumstances in the emergency room to the doctors and the nurses. Your honor, it was not a determination by a magistrate. It was a decision by a police officer that he take her in for evaluation and testing. There was no judicial determination. What was the, what was the language of the order? There was no order. It's what's called a paperless order. Paperless order. But wasn't it to assess the mental competence? No, it was to assess the need for treatment given the fact that she had just tried to commit suicide by running a tube from her, the exhaust pipe in the car into the body of the, you know, of the car. And that's what she was brought to the hospital. Counsel, do you contest the validity of the paperless order? I don't remember any discussion that that was invalid so that there was an order of some type. I do not contest the seizure by the police officer or the transportation of my client to the hospital for evaluation. What I question is some of the procedures that were utilized at the hospital against the will of what I say. And I don't think it's a matter of was competent. Some of the other defendants don't specifically acknowledge it, but they say there's no evidence that she was incompetent. So I think we have to start with the proposition that both sides agree on, that she was competent. And therefore the question is how, what intrusive medical procedures under what conditions can be applied to a competent person who's brought into the hospital? There is no evidence. Can I ask, I'm sorry, can I ask a question? So, um, you know, one of the, uh, one of the statements that the district court relied on was a statement that appeared in the pleadings from the other side that indicated that the doctors couldn't have known whether your client ingested other toxic substances that she chose not to disclose to increase the likelihood of success in her efforts to kill herself. Now I've got questions for the other side about whether or not that's competent evidence given that it that was a concern that the doctors had. And you've got a patient who is clearly refusing treatment. So isn't it reasonable that for the doctors assuming that that's true, that they had no idea what else might be in her system that could cause her harm? Don't the doctors at that point have some leeway in deciding what treatment and how to how to administer it given that she's a proposition or they might've pumped her stomach out saying, we don't know whether she might've ingested something like barbiturates, which would affect her. Uh, they could have implanted something under her skin. No, they asked that what they do. And in this instance it wasn't treatment. It was presumably testing past the bear a relationship to the state's interests here. The state. So what do you assume Mr. Fogle? What would you say that the doctors could do in that circumstance? Well, what they did, which was to stabilize her, there's no indication that she was not cooperative in everything, but the intrusive procedures that were utilized to go beneath her skin and extract blood, to stick a catheter up her system in order to extract urine and the very heavy psychoactive drugs that were given to her without any notice whatsoever. I think you see a pattern of conduct here where it's clear that informed consent has governed this area of the law, both as a matter of common law and as a matter of private law in all 50 states. This is a matter that's clear as was set forth by the second circuit in that I have cited where it says that the right to refuse unwanted medical treatment has been clearly established. So Mr. Fogle, let me ask you this. Now this is a bit of a quandary for the medical professionals, right? Because if they had done nothing and your client had in fact ingested some other substances that they might not have been aware of or they didn't know the level of toxicity with respect to the carbon monoxide that she had inhaled and she had either become seriously ill or died, then the doctors would be looking at a lawsuit for their inaction. So I mean, what are they supposed to do? Follow the instructions of their patient. I cannot imagine that the estate of a patient who dies who had refused medical treatment would have a cause of negligence on the part of the doctor. Well, given the fact that she had arrived at the hospital based on an order that questioned her mental capacity to, you know, the fact that she had tried to kill herself, first of all, and then you've got this paperless custody order, you don't think that there would have been a lawsuit if the doctors had done nothing? After the patient had said, I don't want any treatment. And the law in which this would be, would defeat inaction. So no, I don't see that as a possibility where the defendant explicit, where the rather the deceased had explicitly requested not to receive treatment. And well, it's a, it's a little bit more preliminary. The doctors hadn't proposed any treatment yet. They wanted to know what's the lay of the land is. And at that point they would have to make decisions. But it seems to me the doctors start off with a legitimate proposition to save life. And if she says, for instance, let me die, let me die. I'm in terrible pain. And the doctors said, Oh, okay. You seem to be competent. Go ahead and die. Is, is that the type of thing we ought to be promoting? Well, I don't know whether we ought to be promoting it, but we certainly have a series of Supreme Court decisions that say that somebody does have the right to refuse life saving medical treatment. That's a matter of personal integrity that, as I said, goes back to the mid-thirteenth century. This is even preliminary to that because they're not sure of her level of competence. They're not sure what's in her blood. They don't, not sure that she's not going to die in their arms. It's a very preliminary assessment. Taking urine is not intrusive at all if she cooperated. And she was already in custody. Her liberty had already been seized by the state under the order. She had been seized and taken against her will to the hospital. That was, she didn't consent to that. And so once she's in the custody of the state, they have some preliminary duties and the blood is not that intrusive either in that circumstance. Now, she made everything intrusive. She kicked him and scrambled about and they had to calm her. They had to restrain her. They had to sedate her. But that wasn't part of the treatment. That was an effort to get blood and urine. And I can't figure out what we tell doctors to do in our society. If we can't let them carry out their oath and try to preserve life as we don't, they, he didn't even know whether she needed stabilization. Well, I'm sorry to keep arguing with you judge, but I think the issue of competency is one that's already been resolved. Nobody here claims of the parties that she was incompetent. One party, the key party, Dr. Severu, who was responsible for her care specifically and repeatedly acknowledged that she was incompetent. So, there's a lot of opposing counsel where they stand on the competency issue. But so far, we've had discussion about some fairly broad principles that there really isn't any argument about in terms of the ability to refuse treatment in certain circumstances. But what's your best case, not using the broad principles, that's anywhere factually similar to this case where you have the patient who's presented after a suicide attempt and under some form of a custody order. What's your best case in some circumstance that's analogous to that? Well, I don't have a case on that level of specificity. But I have cited a number of state court cases and of federal cases in which it is very clearly stated that an individual has a constitutional right to refuse medical treatment even if that medical treatment... Nobody's going to argue about those broad principles, but we have to apply the principles to the facts of a particular case. And that's what I'm looking for here because these facts are not similar, to my knowledge, to most of the cases or all the cases that you've cited. Well, the only cases that hold otherwise are ones in which a third party may be affected by the failure to treat the plaintiff. And that would be obviously true with infectious diseases and a variety of other things. But the law is clear. You may not, and the ethics are clear. You must have informed consent from a competent individual before you perform any procedures. Justice Cardoso, who I quoted here, said, if you perform surgery on a patient who refuses it, you're guilty of assault. Now, that doctor may have had all the positive means at his disposal to try to help that person. But in imposing himself in performing that surgery, he has violated the right of that patient, as Justice Cardoso said, cited by Justice Rehnquist, who gave a long history of the right to treatment. This court decided in charters in the 1980s that a person has a constitutional right to refuse treatment. What more do we need? Mr. Fogel, does it matter that Mr. Fogel, I'm sorry. I was going to say, the defendants would argue that he has to have a constitutional right in that particular hospital, too. I'm sorry, Judge. Mr. Fogel, can you hear me? Yes. Sorry. But one of the distinctions here is that this is, as you point out, a competent person, but someone who is in lawful state custody as a result of this paperless custody order. And back to Judge Agee's question, do you have a case that says that in that context, these defendants should have clearly understood that administering treatment on someone who was unwilling to accept that in custody was so clearly established that they ought to be denied qualified immunity? Well, what I can refer to by analogy are the cases which uphold the right to extract blood or other substances from a criminal defendant who's not only been seized as in custody and is preparing to proceed to trial. If it is allowed to extract that blood for evidentiary purposes, it must be done in a way that is projected by the state. Here, we don't know why it was done. It is all supposition and it is all provided to you by lawyers, not by anybody else. As I said in starting my brief, this case cannot go forward without analyzing why they wanted to do what they did and whether it bore a reasonable relationship to the concerns that they had when my client was presented in the emergency room. I'm sorry, I'm way over, so I'll reserve the rest for my rebuttal. You have some rebuttal, Mr. Fogel. Yes, sir. All right, let's hear from Ms. Lloyd. Good morning. May it please the court, just confirming you all can hear me because my internet has been a little bit shaky this morning. Yes, we can hear you. Yeah, we can hear you. Great, thank you. May it please the court and Lloyd on behalf of defendants Root, Bateman, and Carter, just to give the court a little bit of a roadmap of how we intend to split up this argument. I'm hoping to spend my time discussing the constitutional precedents on qualified immunity, while counsel for Dr. Syverud will talk more specifically about the Virginia statute that brought the plaintiff to the ER, about the state laws already decided in this case, and about the clearly established framework. So before we jump into that legal analysis, what I'd like to make clear at the outset is what the plaintiff is asking this court to do. The plaintiff is asking this court to find that the doctors in this case were constitutionally obligated when she was taken to the ER on an emergency order, having attempted suicide by ingesting carbon monoxide, when she said that she did not want treatment, they were constitutionally obligated to step back, leave her on the table, and let her die, if that was how it was going to go. Opposing counsel says that it's uncontested that at that point Ms. Doe was fully legally competent to refuse treatment. What's your position? So my position, let me frame it first by saying that we are here on a 12C motion, and so we have to take the complaint as it's pleaded, and she has pleaded that she is competent, and so at this, we can all use our common sense and think about whether that's actually true, but at this point, we need to operate under that framework. But I'll tell you why I think that the competency, her assertion of competency, is really a red herring in this case, and doesn't dictate the court's result. So in Washington versus Harper, he relies on, that is an involuntary medication of an inmate case. The Supreme Court said that it doesn't matter if someone is competent about, there can be overriding state interests, which require involuntary medication, if the balancing between the state interests and her objection to that treatment come out to favor the state interest. And so I understand why the plaintiff is really trying to make competency do the work for her, but it just doesn't in this case. And so the proposition- Ms. Lloyd, can I ask a follow-up with respect to the facts here? Because you painted a rather dramatic picture of someone left to die on a table in a hospital, but I mean, and we don't have a lot of facts, and that's part of the problem in this case, but she obviously was, at least the complaint alleges, that she was having conversations with medical professionals. So it appears that whatever effects with respect to the carbon monoxide poisoning that she had suffered when the police officers found her, at least one could infer, taking the complaint the life's most favorable to her, that at that point, it seemed like she was okay. And she was, at this point, the doctors were trying to gauge the state of her health, admittedly, and they wanted to run all these tests. But isn't the fact that she was declining treatment at least suggestive of the notion that whatever emergency had prompted the police officers to bring her to the hospital had largely dissipated by then? Yeah, I would disagree with that, Your Honor, and I do agree that we have to operate only on the facts of the complaint. And that's what I'm asking this court to do, is apply the facts and the law to the facts in the complaint. However, as I used to say to my jurors, we don't have to necessarily check our common sense at the courthouse door. And so here, when we're talking about the minimal intrusions of just getting some basic medical procedures, routine blood work, routine urinalysis, to determine where she is at, I understand that she can physically say, I don't want this, and she physically can violently resist. But I don't think we can draw from her complaint when she admits that she had just tried to kill herself by inhaling carbon monoxide. I don't think that we can say that the emergency has dissipated. Certainly, the officer didn't think that the emergency had dissipated because he acted... In her to the hospital for emergency treatment. She wasn't there to... Under your argument, if we're assuming that Ms. Doe is competent at that point, is this your argument that the factors that you're reciting are the overriding governmental interests? The overriding governmental interest in this case is the interest recognized by the Supreme Court in Cruzon and Glucksburg, which is that the state has an overriding interest in the preservation of life and in the prevention of suicide. And so I think specifically, Justice Scalia's concurrence in the Cruzon case is helpful to this court. And I realize it's a concurrence, so I'll come back around and tell you how it's important there. But what he says is a state hospital receiving someone who has tried to commit suicide cannot be held liable for pumping that person's stomach against their wishes because of the overriding state interest in suicide. And now we're not taught in preventing suicide. We're not talking here about something that invasive. But the court embraced... I know that was a concurrence, but the court embraced that logic in the Glucksburg case about assisted suicide, about that overriding state interest in preventing suicide. And... That's all good law that appears relevant to this case, but did the district court make that sort of analysis? So the district court decided this case on the clearly established prong, which this court most absolutely can do as well. We can have this of the right at issue here, but what it really comes down to, this case is clearly established. I think something that was really important that plaintiff's counsel just said is that I admit that there's no case on the level of specificity of this case. And now that really ends the ballgame for him here. If there is no specific case from the Supreme Court that would have guided the doctor's actions here, then qualified immunity is automatic, and he's conceded that. And so part of the issue with his argument is that he is defying what... Ms. Lloyd, I'm sorry. That's not exactly right because we have said that... We haven't said that in each and every case, if a plaintiff can't show a specific case on all fours, qualified immunity fails. It all depends on the context, doesn't it? And the level of specificity with respect to the right. So let me ask you a question about the extent of the treatment here. Because again, we're dealing with this really sparse complaint, and it appears that the doctors in this case went from 0 to 60 in a hurry. She refused treatment, and then there's some evidence about restraining her, I think, and then all of a sudden, they're injecting psychotropic drugs into her. And I think that's really the gist of the plaintiff's complaint, is that what's the evidence to show that that treatment was medically necessary on these very sparse facts of someone just simply saying, I don't want treatment? What's to say that the doctors couldn't have simply restrained her and gotten what they needed to get from her without injecting her with these drugs? I mean, there's just a level of factual detail here that's missing that's troubling to me. I understand where your honor is coming from. But the question here in this case is not why that medical treatment was necessary, which I think we can use our practical brains and determine that. But just using the facts as pled in the complaint, the question is not, well, why is that necessary? The question is, would it have been clearly established to these doctors reacting to a situation where a suicidal patient who has just tried to kill herself through carbon monoxide, that they would have had no right to treat her in any way if she did not consent? And the answer to that is no. I don't think I'm arguing with you with respect to that broad proposition. The question is, was it clearly established that they could simply go directly to the use of psychotropic drugs in the face of someone resisting treatment? And of course, the psychotropic drugs would have would have been so that she didn't injure them or herself by struggling too hard. Well, what's the evidence in the record that she was? I don't think she can test that she struggled so hard that she required physical restraints, even with the use of these drugs. Her complaint pleads that they tried these drugs and then they physically restrained her in order to get her urinalysis done. Let me ask you a little different question before your time runs out. If a woman in a similar circumstance is brought to the emergency room by her daughter. And the daughter says she needs she just tried to kill herself and we and the doctors did all of this and she protested, would the constitutional right be different? I'm trying to highlight the fact that in this case, the plaintiff was in the custody of the state and the state has certain duties of people in its own custody. And one of them, I suppose, is to try to protect the person's life when presented with an emergency. And I take it in this case that had they done all the assessments, very preliminary assessments and found nothing threatening, they then could have recommended mental treatment or counseling or whatever, and she could have rejected that. But I sort of believe that what's alleged in the complaint are some initial steps taken to assess somebody who's in the custody of the state and who's clearly in risk of harming that person's self. And I'm not sure the state's free to do nothing in that in a custodial circumstance like that. But I'm trying to explore the constitutional right in whether it differs when somebody's in custody as opposed to when somebody just walks in the emergency room. I know there's a statute on the emergency room business where the doctor has to stabilize somebody before they leaves. But can you help me on that one? Absolutely, Your Honor. And you're right that it would be different if you just had a daughter bringing her mom in, the doctors don't see anything in her that maybe corroborates that. Maybe that would be closer to this court's prior precedents, such as in the Bailey case, where there wasn't probable cause that she was a danger to herself. But here instead, and Your Honor, I, I can't tell if my time has gone over because my timer froze. So please stop. Briefly. Okay, thank you. The doctors in this case, were not only not told by constitutional precedent to treat her, they were told by constitutional precedent to treat her versus the Hill versus Nicodemus case out of this court that said that pretrial detainees, the state must prevent suicide, must immediately take steps to prevent suicide, if someone presents with suicidal ideation. And so with that, I'll turn it over to Mr. Peretz. Thank you so much for listening. I'm sorry, before you before you stop, I have one additional question. So, which I mentioned, I would, which I previewed with respect to Mr. Fogle, the district court in this case hung its hat on this statement that appears in the responsive pleading from the defendants that Dr. Severod couldn't have known quote, whether Doe ingested other toxic substances that she chose not to disclose to increase the likelihood of success in her efforts to kill herself. You know, that to me makes a lot of sense. It would seem logical that that's true, but that's not a fact. I mean, that's just an assertion in a pleading. And so it gets back to my point about the sort of the sparseness of the facts in this case and whether or not this is a case that might be better left to decide later on. Because I think if a doctor had actually said that in the declaration, it would seem to be a slam dunk at that point. So what's your response to that? I'm going to say three quick things since I know I'm over. One, qualified immunity should be determined at the earliest possible time in a case. And it's our contention there is sufficient evidence in this case to be able to conclude that the doctors would have basically been derelict in their duty if they had just left her on the table. Two, while I agree that that is a statement in a pleading and it's not part of the complaint, which is what we're operating off now, I'm going to return to my invitation to the court to use this common sense. And three, we don't need that statement to win. Because when she concedes she was suicidal, she was in state custody as a detainee being brought in for emergency treatment under 808-I, that she did not consent to treatment, and that the doctors did minimally invasive medical diagnostic techniques in order to determine what to do with her. And again, we don't have any additional actions the doctors did that are complained of, just these, what this court and the Supreme Court has termed minimally invasive techniques of blood tests and urinalysis to determine where to go from here, that we can win on qualified immunity at the pleading stage. Thank you so much. Thank you. Mr. Peretz, we'll hear from you. Thank you, Your Honor. And may it please the court, Mark Peretz on behalf of Dr. Severud. And I'd like to begin where my co-counsel, Ms. Lloyd, left off in responding to the question that was just posed. I do agree, it's a matter of common sense to make a statement such as the doctors did not know whether she had ingested other substances, they did not know how much carbon monoxide she ingested, etc. Those are matters of common sense rather than specific facts. But in addition to that, what we have in this case is in the- Just, not that anything needs to boost what you just said, but it seems to me when there is no knowledge, then the possibilities, the whole range of possibilities are available for discussion. And the whole role of the doctor is to eliminate the speculation and to find out what's going on. And so that the taking blood and urine to conduct analyses is precisely to find out if those types of possibilities are there. And I don't think a doctor has to, or there has to be an allegation that the doctor didn't know whether toxic stuff, the whole purpose for the assessment is to decide the unknown, is to shed some light on the unknown. But anyway, I didn't mean to interrupt you at this point. That's all right, Your Honor, your point is very well made. And to buttress that point, we have specific allegations in this case, in the complaint, that what the doctors were doing was for the purpose of evaluation, to explore those issues and to find out what was going on. And in particular, that appears in paragraphs 14 and 16 of the complaint, among other places. But another very important point that we have in this case is, hypothetically, if we checked our common sense, if we did not look at those specific allegations of the doctors in this case are entitled to exercise their professional judgment in evaluating and treating and doing other things pursuant to their professional obligations. We have cited in our brief, the Youngberg case, as well as the Farrabee case, which discussed that standard, which discussed the deference due to the doctors in exercising their professional judgment. Yeah, but you see the problem that takes you, that takes you to the same with the plaintiff's complaint, the generalities. I mean, you take a cruise-on situation, and the doctors had the ethical duty and the professional duty to save and protect life, and their best judgment is to provide life mechanisms. And yet, the law says again and again that the individual has a broad right to that a doctor is entitled to freedom from liability in the exercise of his professional judgment. I think you have more serious problems here, more particular problems, which you have is an emergency with unknown facts where a person's in state custody and tried to kill himself or herself. And the rest of the circumstances are unknown, but this is all presented to the doctor. What is the constitutional status of the doctor at that point? And it seems to me there is no constitutional right to suicide, but the doctor operates against that background all the time. Yes, Your Honor, that is correct. And that goes to the issue of making sure that we define the right specifically enough and narrowly when we are putting ourselves in the position of the reasonable physician in this instance. But before I leave this professional judgment point, I wanted to emphasize that in Ferebee and Youngberg, and this is the critical point for this case, is it is the burden on the plaintiff to allege the absence of professional judgment. And if, as the point has been made, we have no idea why they did what they did. Now, we don't necessarily agree with that. But if we take that proposition that the record does not show why they did what they did, that is fatal to the plaintiff's case, not to the defendants, because the plaintiffs have the burden of alleging and showing the absence of the exercise of professional judgment. Again, that is crystal clear. Counsel, I think this is raised because the plaintiff says, well, I was competent. And if you, in the abstract, if you take a competent patient, then that limits what the physician can, it would seem to me, what the physician could claim in terms of the exercise of their professional judgment if you have a competent patient who of medical treatment. I mean, that's seems like to me that's a threshold dilemma here, whether this person was competent or whether or not the fact of the suicide and the custody order takes it out of that realm. Yes, Your Honor. And we agree that every situation is different and every situation must be evaluated on its own. Whether a person is competent, whether a person is whether a person is unwilling to submit to an evaluation to determine their medical condition, whether they have been seized under an emergency custody order. As in this case, we are not talking about a blanket, competent person with no other alleged facts. We're talking about a person who has been validly seized pursuant to an emergency custody order with certain factual predicates that go along with that, including that they have mental illness, that they are a harm to themselves or others. But I think the response of Judge Agee and me is to your argument, emphasis on the fact that the doctor exercised professional judgment. And to me, that not only is irrelevant, but it hurts your case if it's dependent on that. The idea that it's assumed the doctor's exercising judgment, the question is whether he has a right to her will. And that's more the issue. It's not whether he has a right to exercise his judgment. We're not talking about the doctor's constitutional rights to practice medicine or the level of it. And so I, I'm not sure I understand how pursuing this course of argument helps the case or is possible at this status in the case where you have allocations of complaint, which don't even talk about the professional judgment of the doctor. Certainly, Your Honor. And the issue is raised simply to respond to the questions earlier and the point raised by, uh, the appellant that the absence of any knowledge or facts about why the doctors did what they did is somehow fatal to the case. And I was simply pointing out that under Youngberg and Faraday, it's the opposite. But But, Your Honor, we agree that the critical analysis here is not necessarily the that there is no case. And, um, we discussed this earlier today. There is no case, uh, that is similar factually to this case. There is no case in which a person was seized pursuant to an emergency custody order when the person was suicidal, when the person was brought to an emergency room and they were unwilling to consent to measures for an evaluation. There is no way for the reasonable physician to know that conducting this evaluation, uh, taking a urine sample, taking a blood sample, putting in restraints, all the things that are alleged in complaint. There is no case that is even remotely close on the facts to inform the reasonable physician that their actions would violate a constitutional right. So what we have here is not only the absence of the case and the absence of anything that we can look to to show we have knowledge by these reasonable physicians in this circumstance that their actions would violate a constitutional right. But we have the Virginia statute, which specifically informs this process and instructs the physicians to do exactly what they did. Now, there are a couple of reasons. This statute is important, but I want to point out, even in the absence of this statute, there is qualified immunity because the plaintiff, the appellant, cannot point to a particular case or a particular circumstance that would inform these doctors that their actions would violate the constitutional right. But the existence of the statute further emphasizes to the doctors this is what they are supposed to do. This person was brought in pursuant to an emergency custody order, was transported to the facility for evaluation and that's exactly what was occurring here. It would have gone very smoothly had she not refused a urine sample in the blood sample, but she refused. And so other things were going on as well. But all of those things were done pursuant to this statute. And until a court informs physicians in the circumstance that they should not follow this statute, qualified immunity is something that must be imposed. Our time is up. Thank you, Mr. Perkins. Mr. Fogel? I didn't do that. Sorry. Thank you. Yeah, that's good. First, I want to quote from this court's opinion in United States versus charters in 1987. Quote, The doctrine of informed consent provides that a patient has a right to be informed of the value and possible consequences of a treatment and to refuse to consent to that treatment. Now, with that statement, what is it that Dr. Severide should have known? He should have known from Kruzan, Clarksburg, Washington, that she had a liberty interest in not having intrusive medical procedures. And let me just, as an aside, these are not minimally intrusive procedures. I've set forth in my brief case law, which has suggested these are serious intrusive procedures, including the use of those psychotropic drugs, including the use of physical restraints in order to secure the information. And we don't know why that information was necessary. The notion that you can apply your common sense is interesting, but it's also interesting that Mr. Carter, who was the chief nurse, gives a very different reason than Dr. Severide does as to the reason why such blood tests and urine were necessary. So it's not clear that there was any rational reason between the two of them why those tests or examinations were necessary. And so I urge you to recognize that this case cannot proceed without knowing why those procedures were necessary, how necessary were they, did the doctor consider... Why is that relevant to our analysis now? It seems to me the allegations of the complaint basically were that she's presented in an emergency context, she's in the custody of the state, and the doctors are given the background and they start taking their steps. And your argument or claim in the complaint is that this violated our Fourth Amendment rights. And it seems to me that's as far as we have to go in this case is whether the Fourth Amendment rights were violated or whether the doctors were immune from any such suggestion because a reasonable doctor in that circumstance would not have understood that he couldn't do that. Well, what the defendants are arguing is that having somebody brought into the hospital who tried to commit suicide, they could not be questioned with anything they did. That the presumption has to be that the doctor was acting in accordance with regular principles, that the doctor had no animosity, and the further assumption as to the reason why the doctor did it. The Supreme Court has already said that a state's interest in the protection of life, and that's the only interest that's been asserted here, falls short of justifying any plenary override of individual liberty claims. And that's what an issue here, an individual liberty claim. And I respectfully suggest that that's too broad for what we're facing, because we're facing a situation more analogous to a when the state goes into a home and seizes a woman for abuse of children and takes her into custody, or an inmate in the custody of the state tries to commit suicide, or any other person in the custody of the state tries to harm himself and on an emergency basis is taken to the hospital. It seems to me that is the context we're in, isn't it? Well, again, when the Supreme Court says that a person has a right to refuse, of course they do, they have a right not to even go to the hospital. In this case, in this case, she was seized by the state and taken to the hospital. So now at that point, her rights, if they didn't have a right to take her to the hospital, you should be going back and arguing they had no business in seizing her. Now, why did the state have a right to seize her? Because in the opinion of the officer, as justified, as authorized by the statute, it was his belief. And that wasn't unconstitutional. That's that abuse of a constitutional right. That's a liberty interest that was violated, right? No, because he asserted probable cause, which he had to believe that she had attempted to commit suicide. And the statute authorizes... Well, once you get on that slippery slope and say that she is legally in the responsibility under the Constitution and all the cases that talk about the situations where people suffer injury or aren't treated properly or their lives are not protected while in custody. I mean, they have all these prisons have these situations where they put people on suicide watch in order just to prevent that liability. And the suicide watch imposes further intrusions and lights turn on and they come in and check the person and he's upset because his sleep's been disturbed. And we get these cases. Yes. And so the real question is, where do we see where a doc is held to have violated a constitutional right when he addresses the presentation of a person in state custody who's tried to kill herself? Well, again, the difficult question here is contrary to the cases that you refer to, those cases describe the precise reason in the record for what was done and why it was done. We have no such indication. No, we don't have a malpractice claim. We have a question here of whether the doctors are allowed to leave her alone or the doctors proceed with what they thought they should be doing. There's no allegation that the doctors committed malpractice. The allegation you're making in this case is that her liberty interest was infringed. And the doctor asserts, I can do anything I want. But the answer is, we don't know why the doctor wanted that information. And there has to be a pretty good reason in the record why he wants to engage in intrusive medical procedures, psychoactive drugs, extraction of blood with the use of subcutaneous methods, the extraction of urine in a very embarrassing and painful way. We don't know why that happened. And I think it would be improper for this court to simply say, well, it's a matter of common sense that most doctors would or might do that. We need that information in the record. And that's what I have is why do we need it? In other words, the allegations of the complaint are the infringement on a liberty interest. It's not on a malpractice claim, checking the doctor's judgment. In other words, had the doctor just took her blood pressure and took her pulse, that's another assessment that the doctors do. She could have refused that, too. We're talking about a liberty interest and the doctor's infringing the liberty interest by trying to take blood and get a urine sample. But anyway, I understand your argument, but I think you have to the specificity is important in this case because we do have the suicide attempt and we do have the seizure state seizure of her against her will, brought him into the emergency room and her rejection of the whole process. She didn't want to be there. She didn't want treatment. She didn't want to have blood taken. She didn't want to give her urine. And we understand that. But I think the interest issue here, you sued under Section 1983 in the Fourth Amendment, and that's the issue is whether her liberty interest was violated in those circumstances. Isn't that the issue? Yes. Yeah, I thought let me if I just may finish. Yes. Rules in the way you seem inclined to rule. What is also important here is that the doctors get information about what the extent of their authorization to conduct procedures against the wishes of a competent individual where there's been no court adjudication. And the irony here is that if the person were incompetent on the state law, the doctor would have had to go to court to get authorization to do this. That's the irony. But we had a competent person. And so they assert we don't have to go to court. Thank you very much, Your Honor, for your. Thank you, Mr. Fogle. And thank you to all counsel for your arguments. We ordinarily, as a customer of the Fourth Circuit, come down and greet counsel. And it's something we miss. I don't know if the lawyers miss it, but we've always found it to be a nice. My mask got me. Yeah, well, anyway, we greet you from our remote positions and thank you very much for your argument. We'll proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, Albert Diaz